The opinion of the Court was delivered by
DuNKiN, Ch.
This Court is so well satisfied with the conclusions of the Chancellor, upon the several legal propositions discussed in the decree, that it is deemed unnecessary to express more than a general concurrence in the principles announced. And, in the application of those principles to many of the questions involved, the Court is equally well satisfied. The decree substantially determines, (and we think rightly,) the existence and validity of the contract of February, 1847, of which the complainant asks the specific performance; that possession was taken by the defendant under that contract, and that the plea of the *397 statute of frauds was inapplicable. It is further ruled, that when the complainant entered into the contract, he had a good equitable title to the premises, of which he was in possession and which he agreed to convey to the defendant, — the complainant had, in the language of the decree, “ an equitable title, with the ability, at some time, sooner or later, to make a good legal title;” and furthermore, that “the contract proved did not provide for the making of titles by a specified time.” “ There was in the contract,” says the Chancellor, “ not only a want of stipulation as to the time when titles were to be made, but possession was to precede the title, and was taken accordingly.” The decree also determines, after fully considering the defendant’s exceptions to the Master’s report of July 1, 1851, that the complainant had then a good legal title to the premises, and that, “ if there is any impediment to the enforcement of the contract of sale, it does not. consist in a present insufficiency in the title, but must arise from some other cause.” The Chancellor then reviews the correspondence, and the conduct of the parties, from February, 1847, to the' latter part of December, 1848, and concludes, that in consequence of the neglect or unnecessary delay of the complainant, under the circumstances, the defendant was well warranted in his abandonment or surrender of the premises, on January 1, 1849, and that the complainant was entitled to the aid of this Court.
Although, as Mr. Sugden declares, “ every case of this nature must, in a great measure, depend upon its own particular circumstances,” (p. 445.) yet there are certain leading principles, which direct the judgment of the Court, in granting or refusing relief, where time is not an essential part of the contract. These are clearly stated in the decree. Where no time is fixed in the contract, or where time is not essential, it will not, however, be permitted to the party, who is to make the conveyance, to trifle with the interests'of the opposite party, by unnecessary delay; and it is in the p’ower of that party to fix some reasonable time, not capriciously or with intent to surprise, but a reasonable time according to the circumstances of the case, within which he will *398 expect the title to be made, at the peril of rescinding the agreement. These sound principles are abundantly sustained by the authorities cited. It remains only to add, that, after such pre-emptory notice, it becomes the party notified, if, from any cause, he is unable strictly to comply, to apply promptly for the aid of the Court by filing his bill.
About the principal facts, there is no dispute. As early as April, 1847, the defendant, having examined the complainant’s papers, was aware of the defects in his legal title, and brought them to the particular notice of the complainant. In that yeai^ however, he went into possession of part of the premises, and, in January, 1848, he took possession of the whole, and planted and gathered the crop of that year. By the terms of his agreement, he was to pay the complainant one thousand dollars, on March 1, 1848. In his letter from Philadelphia, of January ll, 1848, he suggests to the complainant the propriety of having the land papers prepared at once, and when they are completed, submitted to the defendant’s legal adviser, Mr. Hutson, of Qrangeburgh, who would examine them, and advise him, so that he should be prepared to act. It does not appear, that the defendant made his payment of March 1,1848, although, as the Chancellor has ruled, “ the making of titles was not a condition precedent to the defendant’s first payment, as he seems to have supposed.” We concur with the Chancellor in this construction ; and yet the defendant may, very exusably, have supposed that they were dependent covenants, and the complainant may also very well have supposed, that this was the extent of the penalty he might incur, for not having the title completed at that time. Certainly, the complainant should have taken measures to perfect his title prior to J anuary, 1848, and the duty was still more imperative during that year. Yiewing his conduct in the most favorable light, he was guilty of neglect; and the only inquiry is, as to the effect of that neglect on the rights of the parties. There is no arbitrary rule upon the subject. It depends very much, not only upon the situation and conduct of the parties, but also upon the state of the title. In 1847, the *399 defendant was let into possession of part of the premises, and in January, 1848, of the whole, under the contract set forth in the pleadings. He continued to use and cultivate the premises during these years. Early in 1847, he was aware of the complainant’s equitable title, and became also informed of the infirmity or defects in his legal title. These were brought by him to the notice of the complainant, in the spring of 1847; and his entry into full possession in January, 1848, was done with perfect consciousness that the legal title was yet incomplete. In his letter of January 11, 1848, he says. “ I take the liberty of suggesting the propriety of having the land papers prepared at once, and if, when they are completed, they are handed to Mr. Hutson, of Orangeburgh, who has attended to my law business, &c.” The evidence affords strong reason to infer, that the complainant, as the most ready and certain mode of complying with this suggestion, addressed himself to the same professional gentleman for the purpose of having the papers prepared. An important defect in the complainant’s chain of title was the want of a conveyance from the co-heirs of his deceased mother, Mrs. Elizabeth Thompson, — the partition of that estate, under which the complainant had held exclusive possession since 1839, having been informal. The deed of conveyance for this purpose, to be executed by the several parties who were of age, was adduced at the hearing. It is in the hand-writing of Mr. Hut-son, is dated by the draftsman, as prepared for signature, in the year 1848. The month was left in blank, and also the year of Independence. From which it is most probable that the deed was prepared prior to July 4,1848. This conveyance was executed by the parties on December 25,1848, and the renunciation of inheritance within fifteen days afterwards.
The other defects in the complainant’s legal title were not to be supplied by so plain a process. A release from Mr. and Mrs. Hampton was to be obtained, and a conveyance from the infant heir of William Sabb Thompson; and it became furthermore necessary to establish by parol evidence the legal title of the complainant in the interest of Thomas Sabb, or the extinguish *400 ment or satisfaction of that interest. In the Spring of 1848, Mrs. Hampton died, and the infancy of her child added, very materially, to the difficulty and embarrassment in perfecting the legal title. It was for some time doubtful in what mode these difficulties could be obviated. So serious were they, that, in the judgment of Mr. Hutson, they had become insurmountable, and so, in the course of the year, he informed the defendant; for, on December 11, 1848, he writes to the complainant that he must relinquish the purchase, (not as it would seem from the letter, on account of the delay in completing the legal title,) but because of “ being advised by his attorney, after an examination of the complainant’s papers, that a clear title could not be made? It is now manifest, and it is so adjudged, that in this opinion the legal adviser of the defendant was mistaken. The difficulties have been removed, and the legal title perfected. But the embarrassing state of the title has always been recognized as affording a reasonable excuse for delay, and especially under the circumstances of this case. Where “ a purchaser is aware of the objections to the title, and proceeds with the purchase, although the time fixed for the completion of the contract may have elapsed, and a much longer period may be requisite in order to make a good title, he will be held to have waived his right to object to the delay, and not be enabled to resist specific performance.” See a collection of the cases in a note to Seton vs. Slade, 2 vol. 2 part, p. 15, White and Tudor’s Lead. Cases in Equity. But the defendant, in his letter of December 11,1848, for the first time, notifies the complainant of his intention to relinquish the purchase, for the reason therein stated; and, in his more formal communication of the 23d of the same month, advises him, that if good titles are not tendered by the 1st January, he should consider the contract at an end; and accordingly, on January 1, 1849, he informs him of the abandonment of the premises and of the contract. It is hardly necessary to say, that if it was the duty of the defendant, after having determined to abandon his purchase, unless the legal title were completed, to give the complainant reasonable notice of his intention, or, in *401 the language of the authorities, “ to fix some reasonable time, according to the circumstances of the case, within which he would expect the title to be made, at the peril of rescinding the contractthis notice was entirely insufficient. The defendant had been, during the whole year, in the full and undisturbed enjoyment of the premises which he had agreed to purchase. He had paid no part of the purchase money, although one thousand dollars had been payable on March 1, 1848. In his letter of April 13, he refers, it is true, to the delay in relation to the titles, but he says, “ I am ready now, as I have been, to make the first payment when the titles were prepared, and I only'wait your action.” The complainant might very well understand from this, that the defendant intended to make no payment until the title was completed. But there is no evidence of his being apprised of any more serious consequence of his delay, until the receipt of the defendant’s letter of December 11, communicating the legal opinion that a clear title could not be made, and the notice of 23d December, that unless good titles were made within eight days, the contract would be rescinded. From this period, certainly, the complainant seems to have been sufficiently on the alert, not only in having his title completed, but, as. we all think, in applying for the aid of this Court in enforcing the performance of the contract. In the letter of his solicitors, of February 9, 1849, they inform the defendant of the precise nature of the difficulties in relation to the title,’ of the causes of delay, and of the mode of removing them, and intimate, if their opinion should not be satisfactory, as to his obligation to complete the contract, that he might select the forum, either of the State or Federal tribunals, in which the matter might be adjudicated. The bill was accordingly filed in August succeeding.
A recent decision in the English Court of Chancery has been brought to our notice, not as enunciating any novel principle,, but as exhibiting the judgment of an able Chancellor in the application of well known and established rules. Southcomb vs. The Bishop of Exeter, (6 Hare, 213,) 31 Eng. Ch. Rep. 212, is very analogous , in many of the circumstances, to this case. *402 The bill was by the vendors, for the specific performance of a contract. It was dated October 16, 1840. The purchaser was to pay 20 per cent, deposit, and the balance on the 29th September, 1841, at which time the contract was to be completed, and the purchaser to have possession. The abstract of title was delivered on the 30th October, 1840. After some correspondence in relation to the title, the defendant, on August 20,1841, informed the complainants, that his legal advisers regarded the title as defective, and desired the plaintiffs to regard that letter as notice of his intention to rescind the contract. Subsequent correspondence, however, ensued, but always under protest that the defendant relied on this notice. The correspondence was not concluded until January 17, 1842, when the defendant’s solicitors informed the vendors’ solicitors that their client would fall back to his position under the rescinded contract, and referred to the letter of August 20, 1841.
The bill was not filed until 30th August, 1843. The Vice-Chancellor (Sir James Wigram) says, “the position of the vendors and purchaser, in this case, was this : on the 20th August, 1841, the purchaser had taken upon himself to declare the contract at an end, &c.and then adverts to the other circumstances. “ Now, if,” says he, “ the plaintiffs had, immediately on the receipt of the Bishop’s letter of the 20th August, 1841, or had, within a reasonable time “afterwards, filed their bill, I could have had no doubt of the vendors’ right to the common reference as to title.” The bill was, however, dismissed on the ground of the delay from 17th January, 1842, till 30th August, 1843. “ I dismiss the bill,” says the Vice-Chancellor, “ upon the sole ground of the vendors’ delay in filing the bill, after the purchaser had given him distinct notice that he asserted a right to rescind the contract, and considered it at an end.” According to this decision, the complainant, in the cause before us, was entitled to the common reference of title; and it being well settled that the vendor is entitled to a decree, if he can make out the title at the time of the Master’s report, we are of opinion, that the plaintiff is entitled to the aid which he seeks.
*403 It is ordered and decreed, that upon the execution, by the complainant, of a conveyance in fee simple of the premises described in the pleadings, with the usual covenants, and delivery of the same to the defendant, or his solicitors, the defendant pay to the complainant the purchase money, to wit, the sum of six thousand dollars,..with interest on the several instalments as they successively became due, according to the contract recognized and established by the Circuit decree, and that the premises stand pledged for the payment of the same.
It is finally ordered and decreed, that the costs, up to the filing of the Chancellor’s Circuit decree, be paid by the complainant, the subsequently accruing costs by the defendant.
DargaN and Wardlaw, CC., concurred.

Decree reversed.